HATTIESBURG PRODUCTION CREDIT ASS'N *v.* McNAIR.

(Division A. Oct. 19, 1942. Suggestion of Error Overruled Nov. 16, 1942.)

[10 So. (2d) 97. No. 35056.]

616

E. L. Dent, of Collins, and R. E. Spivey, Jr., of New Orleans, La., for appellant.

G. H. Merrell, of Collins, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This is a suit to recover from the appellant, Hattiesburg Production Credit Association, domiciled at Hattiesburg, Mississippi, the proceeds of a check in the sum of $174.50 issued by the said association and payable to C. R. Sullivan, and which check was "cashed" by the appellee, H. A. McNair, at his country store located a few miles from Mount Olive, Mississippi, at a time when the appellant was engaged in the business of making loans to farmers in that section for the financing and production of crops during the year 1938, and had an office at Collins, Mississippi, with K. C. Gandy in charge as local agent, who had authority to receive applications for loans, make inspections of the security offered therefor, and submit them to the home office at Hattiesburg for approval.

C. R. Sullivan then owned 253 acres of land located near the store of the appellee, as well as certain livestock and farming implements. It seems that he had already encumbered this security in obtaining a loan from the Jackson Production Credit Association, and had a brother

named Dewey W. Sullivan, who, according to the testimony of the appellant's said local agent, went to the office of the said agent and stated to him that his name was "Dewey" but that he signed as "C. R. Sullivan," and made the application for the loan in question, signing the application in the name of C. R. Sullivan. Thereupon, the local agent Gandy went out to the farm of C. R. Sullivan, inspected the security and finally recommended that a loan in the sum of $275 be granted. Thereafter, a note and deed of trust were accordingly executed for the loan in the name of C. R. Sullivan, and while the testimony, when considered alone, is in conflict as to whether the person who actually signed the loan papers was Dewey or C. R. Sullivan, the answer of the appellant as defendant in the court below settles that issue by its averment to the effect that: "A loan was made to a party who represented himself to be C. R. Sullivan and forged the name of C. R. Sullivan to the application for a loan and to the note and deed of trust evidencing and securing payment of the loan, and which deed of trust purported to convey the crops and chattels of C. R. Sullivan."

The proof discloses that during the pendency of the application for the loan, the local agent Gandy called on the appellee at his store and discussed with him the fact that the association was making a loan to C. R. Sullivan and suggested that if the applicant should want the appellee to cash his loan check, or should want any assistance before the check came, that it would be all right. In fact, he requested that appellee cash the check for the borrower when it should arrive. Whereupon, the appellee asked: "Which one is C. R., is it Dewey?" and Gandy replied "Yes, Dewey, I mean, but he signs his name C. R." This conversation was admitted by Gandy, to the extent that he told the appellee that insofar as he knew Dewey and C. R. Sullivan were one and the same person, that such was his understanding and requested that he cash the check. Subsequent to this conversation,

Dewey W. Sullivan opened a charge account at the appellees' store pending the consummation of the loan, induced appellee to take him to the office of the appellant, Hattiesburg Production Credit Association at Hattiesburg, where the said Sullivan called on the general manager to discuss the same during the pendency of the application, and later called the Hattiesburg office on two occasions by telephone from the store of the appellee and talked about the loan, giving his name over the phone as C. R. Sullivan. When the loan check came for the first installment in the said sum of $174.50, being sent through the mail to "C. R. Sullivan, Route 3, Mount Olive, Mississippi," it was carried to the store of appellee by the said Dewey W. Sullivan, who then stated to the appellee's wife that his name was Dewey Sullivan and that he wanted to get the check cashed and to pay his account, saying "I want to endorse this check just as it is made out. I sign my name C. R. Sullivan." He then endorsed the check in the name of C. R. Sullivan in the presence of Bertha McNair, wife of appellee, and thereupon the appellee, H. A. McNair, was called to the house and he cashed the check after deducting the account owed to him by Dewey W. Sullivan, including the price of some fertilizer purchased on that occasion for farm use. Appellee's testimony was to the effect that at that time he still thought that Dewey W. Sullivan and C. R. Sullivan were one and the same person. The check was later endorsed by the appellee, deposited in the bank at Mount Olive, and was thereafter duly paid by being charged to the account of the appellant at its bank in Hattiesburg, Mississippi.

Subsequent thereto, both the Jackson Production Credit Association and the appellant undertook to enforce the liens of their respective deeds of trust against the property of the real C. R. Sullivan, and in the litigation which ensued it developed for the first time, so far as the knowledge of the appellant was concerned, that the defendant

in that litigation had in fact neither endorsed the check in question nor authorized its endorsement. Upon that trial, the appellee McNair was introduced as a witness by the appellant in the case at bar and was able to point out in the court-room both Dewey and C. R. Sullivan and stated that he paid the money to the former; also on that trial, the local agent Gandy, being confronted by both of the Sullivans in the court-room, testified as a witness that he though the real C. R. Sullivan was the one with whom he had dealt. Neither of these two witnesses, however, gave any testimony upon that trial that can be construed as an admission that either of them knew at the time the loan was obtained from the appellant and its check was cashed that Dewey and C. R. Sullivan were not one and the same person, except the appellee McNair testified in that trial that on the occasion when he cashed the check the said Dewey Sullivan stated to him that when his loan check came it would be in his brother's name; and he further testified that the check had already been endorsed in the name of C. R. Sullivan before it was brought to his store to be cashed. Upon the trial of the present suit, the trial court evidently thought that the witness was honestly mistaken in his former testimony about when the check was endorsed, since it had in fact been so endorsed when presented to him, as it had been endorsed by Dewey in the name of C. R. Sullivan at the store in the presence of Bertha McNair before appellee had come to the store. This testimony of the appellee as a whole is set up in the present suit as an estoppel against his recovery herein on the ground that such testimony caused the appellant in the case at bar to notify its bank at Hattiesburg to rescind its action in charging appellant's account with the check in question and to send it back to the bank at Mount Olive to be made good by the appellee as endorser thereon. The court below, however, after hearing the explanations of both McNair and Gandy, as to their confusion about the matter, and finding

that it was true that the check already bore the name of C. R. Sullivan when it was actually presented to the appellee McNair to be cashed, held that the appellee had not come into court with unclean hands when suing for the recovery of the proceeds of this check which he had paid back to the bank at Mount Olive on demand; and awarded him a decree against the appellant for the said amount.

Appellant also invokes Section 2679, Code of 1930, of the Negotiable Instruments Act, in defense of this suit, and which section provides that: "When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument or to give a discharge therefor, or to enforce payment thereof, against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority.

The precise question as to the liability of the drawer of a check, draft, or bill of exchange, which is later endorsed by an impostor who has handled all of the negotiations with the drawer leading up to the issuance of such commercial paper has not been decided by this court so far as any case called to our attention in the briefs of counsel is concerned. But it seems that a majority of the cases in other jurisdictions are in support of the view that where the drawer delivers a check, draft or bill of exchange to an impostor as payee supposing that he is the person whom he has falsely represented himself to be and that his false representations as to his ownership or authority in regard to the property offered as security for the loan or a consideration for the paper are true, the impostor's subsequent endorsement of the paper in the name by which the payee is described is to be regarded as a genuine endorsement so far as the rights of subsequent parties who deal with the paper in

good faith are dependent thereon. Montgomery Garage Company v. Manufacturers' Liability Ins. Company, 94 N. J. L. 152, 109 A. 296, 22 A. L. R. 1224, and annotation page 1228; supplemented by annotation 52 A. L. R. 1326. In Missouri P. R. Company v. M. M. Cohn Company, 164 Ark. 335, 261 S. W. 895, a railway company issued a check to an impostor supposing him to be one of its employees, the check was endorsed by the impostor and cashed by a dry goods company. In a contest between the railway company and the dry goods company as to who must bear the loss, the railway company (drawer) was held liable.

In Uriola v. Twin Falls Bank & Trust Company, 37 Idaho 332, 215 P. 1080, 1083, the impostor assumed the name of another person whose certificate of deposit at the bank he had stolen; and wrote in that name to a third person for the purpose of negotiating a loan on the stolen certificate; the third person, believing the impostor to be the person whose name was on the certificate of deposit, and not knowing that there was a real person by that name, as distinguished from the impostor, purchased a cashier's check payable to the name assumed by the impostor and mailed it to him. The draft was endorsed under the assumed name to an innocent purchaser. The contest arose between that purchaser and his bank, which, when it was discovered that the draft had been procured by fraud, had charged it against the purchaser's account. The court after observing that notwithstanding the form of and parties to the action, the determinative factors were the respective rights of the original and final purchaser of the cashier's check upon the theory that the intent of the original purchaser was to make the check payable to the impostor, held that the bank had no right to charge it against the account of an innocent purchaser since the loss must be borne by the original purchaser (as drawer), and not by the innocent purchaser from the impostor. The court said: "Where a draft is

made payable and delivered to an impostor by the drawer of such draft, the drawer intended it to be paid to such impostor, and it is so paid, and the draft comes into the hands of an innocent purchaser for value and without notice, the drawer must stand the loss as between him and the innocent purchaser.''

In 3 R. C. L. 544, it is stated: ''Where the drawer of a check has dealings with an impostor who assumes a false name, and the check is intended for the person with whom the drawer is dealing, payment of the check by the bank to such impostor, or on his endorsement, will, according to the better view, be authorized and binding upon the depositor. It is a principal of natural justice that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences. As the transaction in such a case begins with the depositor, it is his duty to use diligence to ascertain the identity of the party with whom he deals. The bank has a right to believe that the depositor has acted with full knowledge of the party to whom he gave the check for the money, and its duty to him is discharged when it satisfies itself that the payment was intended to be made to the party who presented it. Also in such a case the intention with which the drawer issued the check has been carried out. The person has been paid to whom he intended payment should be made. There has been no mistake of fact, except the mistake which he made when he issued the check, and the loss is due, not to the bank's error in failing to carry out his intention, but primarily to his own error, into which he was led by the deception previously practised upon him. It seems difficult to distinguish upon principle a case where the check or draft is mailed pursuant to communications from the impostor and delivered to him through the mails, from a case where the check is delivered to the impostor in person by the drawer, or the latter's agent.''

The foregoing statement of the rule is supported by a

great majority of decisions and has been recently reannounced in 7 Am. Jur. 435; 9 C. J. S., Banks and Banking, Sec. 356, p. 742, with numerous citations of authorities, it being stated in C. J. S. that: "According to the weight of authority, where a check is delivered by the drawer to an impostor as payee, in the belief that he is the person to whom or on whose indorsement it will be paid, the indorsement by such impostor is not a forgery, for the reason that the drawer of the check intends it to be indorsed by the person to whom he delivers it, so the drawee bank is not liable to the drawer or his assignee for payment thereon; but there is authority to the contrary. Also, there is no distinction in principle between cases where the check is delivered to the impostor in person and where such delivery is through an intermediary, if the drawer causes it to be delivered to him in the belief that he is the person to whom or on whose indorsement it will be paid."

However, as above stated, the decisions upon this question are not uniform. There is good authority among the earlier cases for the position that a bank or individual who may cash such a check must at his own peril determine the actual identity of the payee. See Tolman v. American National Bank, 22 R. I. 462, 48 A. 480, 52 L. R. A. 877, 84 Am. St. Rep. 850; and Palm v. Watt, 7 Hun, N. Y., 317.

It seems however that, according to the overwhelming weight of authority, the rule is that when the drawer of check, draft or bill of exchange has himself been deceived by the fraudulent acts or representations of the payee or others, and thereby induced to execute, deliver or otherwise part with the same, then, as between him and an innocent holder for value, the drawer himself must bear the consequences. That is to say, where fraud existed in the transaction out of which the instrument arose or in respect of the consideration for which it was given, it is no defense against a holder in due course.

Applying the rule to the facts of the case at bar, it will be noted that the appellant intended that the proceeds of the check in question should be paid to the person who had signed the application, note and deed of trust, and that person was Dewey W. Sullivan, to whom the appellee paid the money, although he represented himself to the appellant to be C. R. Sullivan. If the real C. R. Sullivan had received the check through the mail and converted it to his own use, he would have been personally liable to the appellant for the amount thereof, but the appellant would have had no security for its payment for the reason that he had not signed the application, note or deed of trust. Moreover, before cashing the check, if the appellee McNair had gone with Dewey W. Sullivan to the local agent so as to have the latter identified as the borrower or to the home office of the appellant at Hattiesburg for that purpose, his belief that the bearer of the check was the same person as C. R. Sullivan, the purported borrower, would have been confirmed; and while it is also true that the appellant while intending that the signer of the application, note and deed of trust should receive the proceeds of the check, likewise intended that such person should be the one who actually owned the property offered as security, the fact remains that the fraud existed from the inception of the transaction and it had been perpetrated upon the appellant before the check was ever presented to the appellee for payment. Moreover, the authority of the local agent to make representations to the appellee McNair on behalf of the appellant as to the identity of the borrower is not challenged, and we deem the fact to be one of importance that such agent asked the appellee to cash the check in question for the borrower, stating at the time that it was his understanding that Dewey and C. R. Sullivan were one and the same person.

Section 2715, Code of 1930, of the Negotiable Instruments Act, provides that: "To constitute notice of an

infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith.''

We are of the opinion that under all of the facts and circumstances the finding of fact by the chancellor that the appellee was acting in good faith within the provisions of the foregoing statute at the time he paid his money to the bearer of the check is sustained by the evidence, and that the decree of the court below should therefore be affirmed.

Affirmed.